UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

  Plaintiff,

v.                Case No. 1:15-CR-90-01

DOMINICK T. JOHNSON       HON. GORDON J. QUIST

  Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING MOTION TO SUPPRESS (Dkt. # 52)**

  Defendant, Dominick Johnson, has been charged in a superseding indictment with various offenses arising out of several bank robberies that occurred in and around Kalamazoo, Michigan between May 2014 and January 2015. Johnson has moved to suppress evidence obtained during a traffic stop that occurred on February 27, 2015 on I-94 in Van Buren County, Michigan. On September 23, 2015, the Court held an evidentiary hearing on Johnson's motion, during which it heard testimony from government witnesses, received exhibits, and heard argument from the parties.

  For the reasons set forth below, the motion will be denied.

### FINDINGS OF FACT

  The charges in this case arise out of three bank robberies that occurred in the Kalamazoo, Michigan area. On May 29, 2014, a black male suspect robbed a PNC Bank branch office located in Galesburg, Michigan. The suspect used a black semiautomatic handgun and ordered the employees into the vault. The suspect was observed running out of the bank and getting into a blue sedan, which then immediately drove away. On July 29, 2014, a dark-skinned suspect robbed a

Comerica Bank branch office located in Comstock Township, Michigan. The suspect used a silver handgun and, as in the May 29, 2014 robbery, ordered the employees into the vault. Finally, on January 8, 2015, a dark-skinned black male robbed an Old National Bank branch in Kalamazoo, Michigan.

In February 2015, a confidential informant contacted the FBI's Detroit division with information about the foregoing bank robberies. The informant indicated that he or she was familiar with a person named "Dominique," and the informant had received information that Dominique and Dominique's brother had robbed the PNC Bank and had hidden the cash at their grandmother's house in Chicago, Illinois. The informant identified Dominique's and his brother's grandmother by name and said that the grandmother's house was located S. Van Vlissingen near the intersection of 97th Street. In a follow-up telephone conversation, the informant indicated that Dominique had offered to pay the informant to act as a second driver for an upcoming trip to Michigan and that Dominique had been communicating with the informant by text messaging from cell number (312) 399-3270 (the 3270 number). Cell tower information obtained by the Kalamazoo County Sheriff's Office disclosed that the 3270 number had registered at the precise time the Old National Bank was robbed on January 8, 2015. This same information disclosed that the 3270 number was connected with another phone that was assigned (872) 266-7491, which had registered with a cell tower near the PNC Bank branch office in Galesburg at the time it was robbed on May 29, 2014.

On February 18, 2015, Michigan State Police responded to a traffic accident that occurred on I-94 in Van Buren County. Defendant was the driver of one of the vehicles involved in the accident. Defendant was accompanied by two other black males. Defendant gave his cell number—the 3270 number—to the driver of the other vehicle involved in the accident. Several months earlier, on October 7, 2014, Defendant had been stopped in Berrien County, Michigan for

a traffic violation while driving a rented vehicle on Eastbound I-94. After the officer detected the odor of marijuana and a drug canine alerted on the vehicle, the officer conducted a search and found a gym bag containing two loaded semiautomatic pistols and assorted articles of clothing, including black gloves and a ski mask.

Based on information they had received and a review of persons associated with 9630 S. Van Vlissengen in Chicago (the grandmother's residence), law enforcement officials determined that the "Dominique" to whom the informant had referred was actually Defendant, Dominick Johnson. Also, three days prior to the Comerica Bank robbery, a female caller contacted Kalamazoo "Silent Observer" and said that the person depicted in video footage from a recent bank robbery in Michigan was the brother of her former boyfriend, Dominick T. Johnson, who lived in the Chicago area.

On February 25, 2015, after consideration of much of the foregoing information, Magistrate Judge Ellen Carmody issued a search warrant requiring Sprint to provide "real time" information to law enforcement concerning the location of the cell phone associated with the 3270 number.[1] Sprint began providing such data immediately after the warrant was served.

On February 27, 2015, at approximately 6:00 a.m. Eastern Standard Time, law enforcement officers learned from the Sprint-provided information that the phone with the 3270 number was in the Kalamazoo area. Shortly thereafter, a surveillance team consisting of members of various law enforcement agencies was assembled. The plan was to place officers near banks in the area where the phone's location was registering. At this time, the Michigan State Police was relaying information regarding the location of the phone to members of the team as the information was received from Sprint.

---

[1] The warrant and the application (including the continuation to the application) have been filed under seal in this case as docket no. 65.

At approximately 9:45 a.m., surveillance team member Deputy Erik Benton of the Kalamazoo County Sheriff's Department went to the Comerica Bank branch office at the intersection of King Highway and River Street in Comstock Township.  Deputy Benton pulled into the VFW hall parking lot adjacent to the Comerica Bank building, and as he proceeded he observed a white Chevrolet SUV parked near a storage shed on the VFW property.  Deputy Benton saw two black males in the front of the vehicle wearing what appeared to be green or yellow construction vests.  Deputy Benton turned left and exited the north side of the parking lot, heading west on East Michigan.  As he drove, he observed the white SUV exit the VFW parking lot.  Deputy Benton then pulled onto another street and saw the white SUV pass by, heading west on East Michigan.  Deputy Benton followed the vehicle on East Michigan and called in its license plate number over the radio.  He eventually lost the white SUV at the intersection of Comstock and Sprinkle Road.

A short time later, Trooper John Moore of the Michigan State Police, who had overheard the description of the white Chevrolet SUV on his radio, was parked in his marked patrol car in the median of I-94 in the vicinity of U.S. 131.  Trooper Moore was watching for the white SUV in westbound traffic coming from the Kalamazoo area.  Trooper Moore spotted a white SUV heading west and concluded that it was the vehicle described on the radio based on its last reported location. Trooper Moore reported that the white SUV had just passed his location and a few seconds later, pulled out, activated his onboard video camera, and followed the white SUV at a distance.  Over the next several minutes, as Trooper Moore closed the distance between the white SUV and his vehicle, he received periodic reports of the cell phone location that consistently placed the 3270 number in his vicinity. Based on that information, Trooper Moore and his commanding officer concluded that the white SUV contained the cell phone with the 3270 number.

While following Johnson, Trooper Moore observed the white SUV's right front and rear tires briefly cross or touch the white fog line separating the right-hand lane of traffic from the shoulder. In addition, Trooper Moore observed the white SUV change lanes about one and one-half car lengths behind another vehicle. Thereafter, Trooper Moore activated his lights and initiated a stop of the white SUV for driving on the fog line, in violation of M.C.L. § 257.642(1)(a)[2] and for following too closely, in violation of M.C.L. § 257.643(1).[3] As it turned out, Johnson and three other individuals were in the white SUV, and Johnson possessed the cell phone with the 3270 number.

Following the stop, Johnson was arrested on an outstanding state misdemeanor warrant, and the officers were given consent to search the vehicle. The search disclosed a loaded semiautomatic pistol and an airsoft pistol stowed under the hood.

## Conclusions of Law

In his motion to suppress, Johnson challenges only the lawfulness of the stop by Trooper Moore. Johnson argues that any evidence obtained as a result of Trooper Moore's stop of the white SUV violated the Fourth Amendment because Trooper Moore lacked probable cause to believe that a violation of M.C.L. § 257.642(1)(a) occurred. In response, the government argues that not only did Trooper Moore have probable cause to believe that the white SUV violated M.C.L. § 257.642(1)(a), he also had probable cause to believe that the white SUV violated M.C.L. § 257.643(1) by following another vehicle too closely. The government adds that, regardless of

---

[2] Section 257.642 provides, in pertinent part, that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane . . . ." M.C.L. § 257.642(1)(a).

[3] Section 257.643 provides, in pertinent part, that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon, and the condition of, the highway." M.C.L. § 257.643(1).

whether a traffic violation occurred, Trooper Moore had a reasonable suspicion of criminal activity sufficient to support a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). The Court concludes that Trooper Moore had more than sufficient basis to conduct a *Terry* stop and, therefore, does not address the alleged traffic violations.

The government bears the burden of proving that the warrantless seizure was reasonable. *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987) (citing *United States v. Matlock*, 415 U.S. 164, 177, 94 S. Ct. 988, 996 (1974)).

Although a seizure by the police must generally be supported by probable cause, *see Michigan v. Summers*, 452 U.S. 692, 697, 101 S. Ct. 2587, 2592 (1981), in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), and as refined in subsequent cases, including *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921 (1972), the Supreme Court recognized a narrow exception which permits police officers to make a brief and limited investigative detention. Under *Terry*, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting *Terry*). An officer's reasonable suspicion may be based upon his own observations, the collective knowledge or information from other officers, or, if sufficiently reliable, an anonymous tip. *See United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994). An officer's "hunch" cannot justify a stop, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002). In *Arvizu*, the Supreme Court reaffirmed the "totality of the circumstances" as the proper measure of whether a police officer had a "particularized and objective" basis for suspecting legal wrongdoing. *Id.* at 273, 122 S. Ct. at 750. The Court

emphasized that in reviewing the grounds for a stop, a court should not consider individual factors in isolation from one another, but instead should consider them as a whole, giving "due weight" to the inferences drawn by the officer based upon his experience and training. *Id.* at 274-76, 122 S. Ct. at 751-52. Under *Terry*, "a moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that its occupants had engaged, were engaging, or were about to engage in criminal activity." *United States v. Perez*, 440 F.3d 363, 370–71 (6th Cir. 2006).

At the time Trooper Moore stopped the white SUV, law enforcement officers had the following bases to establish a reasonable suspicion of criminal activity:

- information showing that a cell phone assigned the 3270 number was connected to the PNC Bank and Old National Bank robberies and that Johnson was the owner/user of that cell phone;

- the police had been informed that Johnson and his brother had been observed at a house in Chicago with a large amount of money purportedly obtained through bank robbery;

- Johnson had been stopped on I-94 in October 2014 for a traffic violation and a search of his vehicle revealed two semiautomatic pistols, black gloves, and a ski mask;

- Johnson had been recruiting another person to drive to Michigan in February 2015 for $2,000 to aid in the commission of a bank robbery;

- Johnson had said that he planned to go to Michigan on or around February 18, 2015;

- the police were aware that Johnson was involved in a traffic accident on I-94 in Michigan on February 18, 2015 and had given the 3270 number to the other driver;

- Trooper Moore, who stopped Johnson on February 27, 2015, was the same officer who assisted Johnson and the other driver in the traffic accident on February 18, 2015.

- on February 27, 2015, Sprint provided GPS tracking information indicating that Johnson was traveling to the Kalamazoo area;

- consistent with the GPS location of Johnson's phone, a suspicious white SUV was observed parked near the Comerica Bank on February 27, 2015;

- the GPS tracker indicated that Johnson's phone was leaving the Kalamazoo area in a westbound direction at the same time Trooper Moore was following the white SUV westbound away from Kalamazoo.

Considering the totality of the foregoing circumstances, Trooper Moore had an objective and particularized basis to believe that the white SUV and its occupants were engaged in or planning to commit a bank robbery. Accordingly, the stop was a lawful *Terry* stop that did not violate the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the Court will deny Johnson's motion to suppress.

A separate order will enter.


Dated: October 9, 2015          /s/ Gordon J. Quist
                                GORDON J. QUIST
                                UNITED STATES DISTRICT JUDGE

8